**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KEITH JOHNSON**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 19-1591-KSM** |
| **CITY OF PHILADELPHIA**, et al., | |
| Defendants, | |

**MEMORANDUM**

**MARSTON, J.**                                                                                      **June 3, 2020**

Plaintiff Keith Johnson claims that the Defendant City of Philadelphia demolished three rowhomes on his property without notice and without a proper investigation.[1]  The City brings this motion for summary judgment.  For the reasons discussed below, the Court grants the City's motion on all counts.

### I.    *Factual Background*

Keith Johnson owns eight properties in and around Philadelphia, including the vacant property located at 1866 Brunner Street.  (Doc. No. 1 at ¶¶ 6–7; Doc. No. 29-2 at 133:19–21.)  For seven of those properties, the property deeds list Johnson's residential address as a location where either he or a family member lived at the time of purchase.  (Doc. No. 29-2 at 120:6–16, 123:17 to 124:17.)  But the deed for the Brunner Street property lists the vacant property itself as Johnson's home address, even though he lived on West Albanus Street when he purchased the

---

[1] Johnson also sues the City's Department of Licenses and Inspections.  We consider the City and its subdivision to be one entity in deciding this motion.

property.  (*Id.* at 133:22 to 134:7, 115:7–21, 120:17–22.)

A.      *The March Inspection*

The Brunner Street property is across the street from a community center, and children frequently walk by the property to reach a nearby school.  (Doc. No. 29-2 at 102:24 to 103:19; Doc. No. 29-3 at 61:12–16.)  Johnson purchased the property in 2001 and allowed family members to live there on and off until the end of 2012, after which the property was left vacant. (Doc. No. 29-2 at 28:7–10, 32:22–24, 107.)  In October 2017, Johnson received a letter from Inspector Carlton Smith, who was with the operations department of the Department of Licenses & Investigations (the "Department"), directing Johnson to get a vacant property license.  (*Id.* at 69:14-17.)  Johnson did not get the license, and the City filed a code enforcement complaint in May 2018 to compel him to do so.  (*Id.* at 73:3–20, 74:16 to 75:13, Doc. No. 29-4.)  Johnson waited for the initial court date, June 18, 2018, to address the issue.  (Doc. No. 29-2 at 73:10–14.)

During that time, the rowhomes' exterior wall began to bulge.  (*Id.* at 93–94, 96:7–10.) Johnson had a contractor inspect the bulge in the wall, and the contractor recommended that he install an anchor. (*Id.* at 93:15 to 96:6.)  Johnson spoke with three contractors about pricing to repair the wall, but he did not move forward with the repair before the City demolished the building.  (*Id.* at 95:3–18.)  On March 6, 2018, a neighbor submitted a service request to the City, claiming that "bricks are starting to come out between the windows on the first floor of this abandoned property."  (Doc. No. 29-5.)  In response, the City sent Eugene Stallworth, a building inspector with the Contractual Services Unit (CSU) of the Department to inspect the building. (*Id.*)

Under the CSU Field Manual, inspectors rate properties with structural issues on a scale from 1 to 5.  (Doc. No. 29-6 at p. 17.)  If an inspector rates the property as a 1 or 2 then it is

2

considered "imminently dangerous" (*id.*), which — according to the Philadelphia Property Maintenance Code — means "there is imminent danger of failure or collapse of a structure or any part thereof which endangers life, or when any structure or part of a structure has fallen and life is endangered by the occupation of the structure."  PM Code at PM-108.1.1.

A rating of 3, 4, or 5 means the building is merely "unsafe" (*id.* at pp. 17–18), and:

> [d]angerous to the life, health, property or safety of the public or the occupants of the structure by not providing minimum safeguards to protect or warn occupants in the event of fire, or because such structure contains unsafe equipment or is so damaged, decayed, dilapidated, structurally unsafe or of such faulty construction or unstable foundation that partial or complete collapse if possible.

PM Code at PM-108.1.1.

During his March visit, Inspector Stallworth rated the Brunner Street property a 3 (unsafe), noting that bricks were loose and beginning to fall from the wall and that there was a bulge in the side load-bearing wall.[2]  (Doc. No. 29-3 at 34:12–23, 47:9 to 48:4, 63:22 to 64:4; Doc. No. 29-7.)  Stallworth photographed the bulge (Doc. No. 29-8), and left a notice on the front door that labeled the building unsafe, gave the date of the posting, described the steps Johnson needed to take to address the issue or appeal the determination, and listed the contact information for the Department (Doc. No. 29-9 (time stamped photograph of orange notice posted to the front door of the property)).[3]  The March notice also stated that "IF YOU FAIL TO

---

[2] A building qualifies for a rating of 3 if an inspector finds:

a.   Any building that has a suffered an interior and/or roof collapse but has the majority of its bearing walls still laterally supported and front walls are free of defects;

b.   Any building that has a roof collapse and is causing damage to occupied adjoining properties; or

c.   Any building that is situated in the middle of a row and has suffered a collapse of the roof, floor or ceiling assemblies.

(Doc. No. 29-6 at p. 17.)

[3] Johnson argues that many of the facts are in dispute because to support them the City cites "only the testimony of Stallworth."  (*See* Doc. No. 34 at ¶ 57 ("[T]he Defendants cannot assert something is undisputed fact merely based on their inspector's testimony."); *see also id.* at ¶ 30 (disputing that Stallworth posted notice on the property because "there is no evidence as to who posted the notice other than Stallworth's testimony").)  The Court

OBEY THIS ORDER THE STRUCTURE IS SUBJECT TO DEMOLITION BY THE CITY AT ANY TIME AFTER THIRTY (30) DAYS FROM THIS NOTICE." (*Id.*)

The next day, Stallworth opened a case for the property in CSU's computer system, named Hansen, and another subdivision of the Department[4] sent Johnson a notice of violation (NOV), telling him that the Brunner Street property had been declared "UNSAFE, in whole or in part, pursuant to Section PM 15-108.1 of the Philadelphia Property Maintenance Code." (Doc. No. 29-10.) Like the posted notice, the March NOV directed Johnson to get the necessary permits and address the unsafe condition — a "[b]ulged side wall with loose and falling bricks" — by either repairing or demolishing the property. (*Id.*) The NOV also stated that "[f]ailure to comply with this order within 30 days may result in the City taking action to demolish the structure and to stucco remaining party walls exposed by the demolition" at Johnson's expense. (*Id.*)

It is undisputed that Johnson never received the March NOV. The Department sends an NOV via certified mail any time a violation is reported in the system, and the NOV is sent to the location listed in the system as the owner's primary address. (Doc. No. 29-3 at 57:13–23, 58.) In this case, the system listed 1866 Brunner Street as Johnson's primary address because that was the address identified in the property deed. (*Id.* at 14–16; Doc. No. 29-11.) Because 1866

---

may consider sworn deposition testimony when deciding a motion for summary judgment. *See* Fed. R. Civ. P. 56(c) (allowing the Court to consider facts established by "materials in the record, including depositions"); *see also Fox Intern. Relations v. Laucius*, No. 04-5877, 2009 WL 5184487, at *6 n.4 (E.D. Pa. Dec. 22, 2009) ("Federal Rule of Civil Procedure 56(e) allows District Courts to consider depositions in determining a motion for summary judgment."). To the extent that Johnson has not provided any contrary evidence, the Court accepts the facts in Stallworth's testimony as undisputed. *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by citing to particular parts of materials in the record" or "that an adverse party cannot produce admissible evidence to support the fact."); Fed. R. Civ. P. 56(e) ("If a party fails to . . . properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").

[4] It is unclear who at the City sent the NOVs to Johnson. Stallworth testified that it is not his job to send notices and that he merely fills out the violation form in Hansen, and the system alerts another unit that an NOV needs to be sent to the property owner. (Doc. No. 29-3 at 31:16–18, 58.)

Brunner Street was vacant at the time, the March NOV was returned as undeliverable.  (Doc. No. 29-12.)  Other departments, including other units within the Department of Licenses & Inspections, had Johnson's actual home address and sent letters and notices to that location. (*See* Doc. Nos. 31-2, 31-3, 31-4, 31-5, 31-6.)  Despite that knowledge, the March NOV was never sent to Johnson's home address.

### B.      The May Inspections

Stallworth inspected the property again on May 11, 2018 and found it in the same condition as before.  (Doc. No. 29-3 at 83:3–18, 105:14–23; Doc. No. 29-6 at p. 3.)  A second NOV was sent to Johnson to inform him that the property remained unsafe, but like the previous NOV, the May NOV was returned as undeliverable.  (Doc. No. 29-13; Doc. No. 29-14.)  At that point, Stallworth did not intend to demolish the building, but instead planned to do a third inspection in around thirty days.  (Doc. No. 29-3 at 107:16–21.)

Twelve days later, on May 23, 2018, Philadelphia Fire Department Unit 59 was dispatched to a nearby property.  (Doc. No. 29-15 at p. 2.)   While driving back to the station, the Unit noticed that bricks were falling from a window frame at the Brunner Street property.  (*Id.*) The Fire Department placed caution tape around the property and notified the Philadelphia Police Department and the Department of Licenses & Inspections.  (*Id.*; Doc. No. 29-16.)  Police Officer Heffron and Inspector Stallworth responded to the call.  (Doc. No. 29-3 at 73:7–8, 49:11–13; Doc. No. 29-16.)  Stallworth inspected the property for a third time and discovered that its condition had worsened since May 11.  (Doc. No. 29-3 at 101:13–22.)  He noticed that a wall had partially collapsed, there were bricks on the ground, and he could see within the wall to the wood joists.  (*Id.* at 102:7–11.)

Stallworth believed that the bulging wall was a load-bearing wall.  (*Id.* at 78:13–24.)  He

also knew that the property was located near an elementary school and a community center and

there are "a lot of children that go back and forth on that block in the daytime."[5]  (*Id.* at 61:12–

16.)  For those reasons, he changed the property's rating from 3 (unsafe) to 1 (imminently

dangerous).[6]  (*Id.* at 64:10–21, 80:15–21, 88:1–18; Doc. No. 29-17.)  An imminently dangerous

rating of 1 means the building is sufficiently dangerous to be subject to emergency demolition.

(*Id.* at 64:14–21, 107:22 to 108:11.)

　　　Stallworth posted another notice on the property indicating the new imminently

dangerous classification.[7]  (Doc. No. 29-18.)  The May notice stated that it served "AS FINAL

NOTICE TO YOU THAT THE DEPARTMENT OF LICENSES AND INSPECTIONS HAS

DETERMINED THIS STRUCTURE TO BE IMMINENTLY DANGEROUS AND IN

DANGER OF COLLAPSE IN VIOLATION OF PROPERTY MAINTENANCE CODE

SECTION PM-110."  (Doc. No. 29-18.)  It ordered Johnson to immediately repair or demolish

the structure and warned that if he failed to do so, "THE STRUCTURE IS SUBJECT TO

---

[5] Johnson disputes that children walked near the property, asserting that this "was an assumption made by Inspector Stallworth during his deposition."  (Doc. No. 37 at ¶ 2.)  But Johnson has not put forth any evidence that disputes Stallworth's sworn testimony.

[6] According to the CSU Field Manual, a building receives a rating of 1 if it is a corner property "that has a severely bulged or fractured front or side wall and is within two hundred (200) feet of a school, church, hospital, or recreation center."  (Doc. No. 29-6 at p. 17.)  It is unclear from the record whether the property was within 200 feet of the elementary school and/or community center.

[7] Johnson denies seeing the notice (Doc. No. 29-2 at 109:18–20) and states that he "believes that it was posted and photographed only minutes prior to demolition (Doc. No. 31at p. 2.)  However, there is no evidence that disputes Stallworth's testimony that he placed the notice on the property. To the contrary, Stallworth photographed the posted notice, and Officer Heffron filed an incident report, which documents that Stallworth posted the notice on the property on May 23, 2018.  (Doc. No. 29-16; Doc. No. 29-18.)  Johnson argues that we should not consider Officer Heffron's report because it is hearsay, but his report falls under an exception to the hearsay rule.  *See* Fed. R. Evid. 803(8)(C) (excluding public records from the rule against hearsay when the record sets out "in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness"); *see also Clark v. Clabaugh*, 20 F.3d 1290, 1294 (3d Cir. 1994) (finding that a Pennsylvania State Police Report, "which was authored by officers charged with a legal duty and authorized to conduct the investigation, is presumed admissible under Rule 803(8)(C), including its opinions, conclusions and recommendations, unless the defendants demonstrate its untrustworthiness").  Because Johnson has not demonstrated why the report is untrustworthy, we may consider it in deciding the City's motion for summary judgment.

IMMEDIATE DEMOLITION BY THE CITY AT ANY TIME" and he would "BE BILLED FOR ALL COSTS INCURRED AND ADMINISTRATIVE FEES." (*Id.*)

Stallworth opened a new case for the property in Hansen, indicating that it was now considered imminently dangerous, and a third NOV was sent to the property and returned undeliverable. (Doc. No. 29-19.) On May 25, 2018, the City conducted a curbside bid for the demolition project, and the demolition began. (Doc. No. 29-3 at 61:2–7.) Johnson was not aware of the demolition until it was finished on June 5, 2018. (Doc. No. 29-2 at 112.)

### C.      Procedural History

After the demolition, Johnson sued the City in the Philadelphia County Court of Common Pleas, and the City removed the case to this Court. (Doc. No. 1.) Johnson brings claims for negligent demolition and violations of procedural and substantive due process, based on the City's alleged failure to provide adequate notice of the property's condition and the pending demolition, and the City's alleged failure to investigate whether all three rowhomes were imminently dangerous. (*Id.*) At the end of discovery, the City filed a motion for summary judgment, arguing that it is entitled to immunity on Johnson's negligent demolition claim and that the due process claims fail because Johnson has not identified a municipal policy, procedure, or custom as the cause of his injuries. (Doc. No. 29.) Johnson responds that there are material issues of disputed fact that preclude summary judgment. (Doc. No. 31.)

## II.      Standard of Review

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248.   "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  And at "summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and alterations omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted); *see also id.* at 325 ("[T]he burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case.").  After the moving party has met its burden, the nonmoving party is required to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 323 (quotation marks omitted); *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after

adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.  "In such a situation,

there can be no genuine issue as to any material fact, since the complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts

immaterial." *Id.* at 322–23 (quotation marks omitted).  "[T]his standard makes clear that, even

though the right to a jury trial is implicated, a nonmoving party must adduce more than a mere

scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations

contained in its pleadings."  *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.

1989) (internal citations omitted). "[U]nsupported assertions, conclusory allegations or mere

suspicions" are insufficient to overcome a motion for summary judgment.  *Schaar v. Lehigh*

*Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010).

### III.    *Discussion*

The City argues that it is entitled to summary judgment because it is immune from

Johnson's negligent demolition claim under the Pennsylvania Political Subdivision Tort Claims

Act and because Johnson's due process claims fail under the Supreme Court's holding in *Monell*

*v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  We address each argument in turn.

### A.    *Negligent Demolition Claim*

Under the Pennsylvania Political Subdivision Tort Claims Act, "no local agency shall be

liable for any damages on account of any injury to a person or property caused by any act of the

local agency or an employee thereof or any other person."  42 Pa. Stat. and Cons. Stat. Ann.

§ 8541.  Under § 8541, a municipality enjoys absolute immunity from tort liability unless the

plaintiff satisfies three statutory requirements.  *Mascaro v. Youth Study Center*, 523 A.2d 1118,

1121 (Pa. 1987).  First, he must "demonstrate that at common law or by statute one not having an

immunity defense available could be held liable for the same harm alleged against the agency." *Id*. Second, he must demonstrate that his injury "was caused by the negligent acts of the agency or an employee acting within the scope of his office or duties, excluding acts of crimes, fraud, malice or willful misconduct." *Id.* at 1123. Third, he must show that the municipality's actions fall into one of the nine exceptions listed in § 8542(b): (1) vehicle liability; (2) care, custody, or control of personal property; (3) real property; (4) trees, traffic controls, and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; (8) care, custody, or control of animals; and (9) sexual abuse. 42 Pa. Stat. and Cons. Stat. § 8542(b).

The City focuses on the third prong of this test and argues that it is immune under the Act because none of the nine exceptions apply. In his opposition brief, Johnson does not discuss the City's immunity argument, and instead argues that summary judgment is inappropriate because there is a genuine dispute about whether the City was negligent in its failure to send the March and May NOVs to Johnson's residential address. (Doc. No. 31 at p. 6.)

We agree with the City that it is immune from liability on Johnson's common law claim for negligent demolition because its actions do not fit within any of the nine exceptions to governmental immunity. The only one that even arguably applies is the real property exception, but that "is a narrow exception and, by its own terms, refers only to injuries arising out of the care, custody or control of the real property in the possession of the political subdivision or its employees." *Mascaro*, 523 A.2d at 1123. In addition, for the real property exception to apply, the municipality's actions must have made "the property unsafe for the activities for which it is regularly used, for which it is intended to be used, or for which it may reasonably be foreseen to be used." *Id*. In short, the City's "negligence must make the real property itself unsafe for its intended use" and that "dangerous condition or defect in the real estate" must "cause[ ] the

10

injury." *Williams v. Phila. Housing Auth.*, 873 A.2d 81, 86 (Pa. Commw. Ct. 2005); *see also Martin ex rel. Martin v. City of Phila.*, 696 A.2d 909, 912 (Pa. Commw. Ct. 1997) (holding that summary judgment was improper on immunity issue in a case where a child tripped over a metal goalpost and injured himself because there was a question of fact about whether the goalpost, which lay hidden in leaves at a City park, was a "dangerous condition arising from the care, custody and control of the City's real property").  Neither condition is satisfied in this case.

First, the City did not execute "care, custody, or control" over the property during Stallworth's inspections of the demolition because it did not possess the property.  *See Williams*, 873 A.2d at 86 (explaining that the "right to enter onto property does not give [a municipality] 'possession' of that property within the meaning of the Tort Claims Act"); *City of Pittsburgh v. Estate of Stahlman*, 677 A.2d 384, 387 (Pa. Commw. Ct. 1996) (explaining that "mere occupation of the property for a limited period of time" does not amount to possession); *Alvarez v. City of Phila.*, No. 03-183, 2003 WL 22595204, at *3 (E.D. Pa. Oct. 29, 2003) ("Defendants could not have had possession of the Midvale Property when they ordered and/or oversaw the demolition of the property" and "therefore, the 'real property' exception does not apply in this case.").  Second, Johnson's alleged injury was not caused by a property defect, but by the City's alleged failure to properly investigate or provide notice.  *See Stouffer v. City of Reading*, No. 15-3523, 2017 WL 6368013, at *18 (E.D. Pa. Dec. 13, 2017) (refusing to apply the real property exception because the City merely "ordered the demolition of a building" and there was no claim that a property defect caused the claimed injury); *Estate of Van Der Leer v. City of Phila.*, No. 03-4324, 2004 WL 1336315, at *4 (E.D. Pa. June 15, 2004) (same).

For those reasons, we hold that the real property exception does not apply.  *See Winn & Sons, Inc. v. City of Phila.*, 162 F. Supp. 3d 449, 466 (E.D. Pa. 2016) (granting summary

judgment in favor of the City because "the Tort Claims Act immunizes the City from damages arising from the demolition of Plaintiff's property"); *Guy v. Bristol Borough*, No. 16-1557, 2018 WL 3141429, at *8 (E.D. Pa. June 27, 2018) (granting the Borough's motion for summary judgment because "the PSCTCA's immunity applies and bars Plaintiff's negligent demolition claim"). Because none of the nine exceptions listed in § 8542(b) apply, the City is entitled to immunity under the Political Subdivision Tort Claims Act, and the Court will grant its motion for summary judgment on Johnson's claim for negligent demolition.[8]

### B.   Due Process Claims

In addition to his negligent demolition claim, Johnson brings claims for violation of procedural and substantive due process under 42 U.S.C. § 1983.[9] Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983. Local governments and municipalities are considered persons under § 1983 and may be sued directly under the Act when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690.

"[A] government entity may not be held vicariously liable under § 1983 for the acts of its

---

[8] One case in the Eastern District has recognized another exception to municipal tort immunity. *See Swinson v. City of Phila.*, No. 13-6870, 2016 WL 1383856, at *7 (E.D. Pa. Apr. 7, 2016); *see generally Swinson v. City of Phila.*, No. 13-6870, 2015 WL 7887855 (E.D. Pa. Dec. 3, 2015). In *Swinson*, this court held that "a common law claim for negligent demolition survives the PSTCA where § 14611 and the failure to give notice are elements of the claim." *Swinson*, 2016 WL 1383856 at *7. Johnson does not mention *Swinson* or § 14611 in his complaint or opposition brief, and during oral argument his counsel confirmed that he brings only a common law claim for negligent demolition. Because Johnson does not bring a statutory claim, the reasoning in *Swinson* does not apply and we do not address it.

[9] Johnson's complaint asserts three due process counts — one for violation of procedural due process, one for violation of substantive due process, and one for violations of procedural and substantive due process under § 1983. (Doc. No. 1 at pp. 15–17.) Because Johnson has sued only the City, we analyze both due process claims under the § 1983 framework.

employees under a *respondeat superior* theory of liability." *Winn & Sons, Inc.*, 162 F. Supp. 3d at 459 (citing *Monell*, 436 U.S. at 691). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694; *see also Mulholland v. County of Berks*, 706 F.3d 227, 237 (3d Cir. 2013) ("When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom." (quotation marks omitted)). "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

To succeed on his constitutional claims, Johnson must: "(1) identify a policy, practice, or custom, (2) attribute it to the city, and (3) show a causal link between execution of the policy and the injury suffered." *Winn & Sons, Inc.*, 162 F. Supp. 3d. at 459 (quotation marks omitted); *see also Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984) ("A plaintiff must identify the challenged policy, attribute it to the city itself, and show a causal link between execution of the policy and the injury suffered."); *Brown*, 50 U.S. at 407–08 (explaining that the policy or custom must be the "moving force" behind the plaintiff's alleged injury). "Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Mulholland*, 706 F.3d at 237 (quotation marks omitted). And a "course of conduct is considered to be a 'custom' when, though not authorized by law, such practices of state officials are so permanent and well-settled

13

as to virtually constitute law." *Id.* (quotation marks omitted).

The City argues that summary judgment is appropriate because Johnson has failed to identify a relevant policy, practice, or custom that caused a deprivation of procedural or substantive due process.

### 1.   *Procedural Due Process Claim*

Johnson claims that the City violated his right to procedural due process because the Department mailed the three NOVs to the vacant property instead of Johnson's home address and because Stallworth did not properly investigate whether all three rowhomes were in imminent danger of collapse.  (Doc. No. 1 at pp. 22–23.)  "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).

It is true that "[d]ue process does not require that a property owner receive actual notice before the government may take his property." *Jones v. Flowers*, 547 U.S. 220, 225 (2006).  But the government must "provide notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* (quotation marks omitted).  Notice by certified mail is sufficient for due process purposes so long as the government has "heard nothing back indicating that anything ha[s] gone awry." *Id.* at 226; *see also id.* at 230 (explaining that the City's decision to "take no further action" when the notice letter was returned as undeliverable was "not what someone desirous of actually informing' [the plaintiff] would do; such a person would take further reasonable steps if any were available").  When mailed notice is returned unclaimed, the municipality must take additional reasonable steps, such as resending the notice by regular mail

14

or posting notice on the front door of the property.  *Id.* at 235.  However, the Supreme Court has

rejected a requirement that the government search for a plaintiff's new address because an

"open-ended search for a new address . . . imposes burdens on the State significantly greater than

the several relatively easy options outlined above."  *Id.* at 235–36.

As discussed above, because Johnson has sued only the City, "the relevant inquiry is

whether the City's policies, practices, or customs were adequate to ensure that [Johnson]

received the notice to which he was entitled under the Due Process Clause."  *Winn & Sons, Inc.*,

162 F. Supp. 3d at 460.  The City identifies several policies and procedures which require

personal service and posted notice of an alleged violation.  For example, the Philadelphia

Administrative Code § 4-A502.4 states:

> **Method of service**: A notice of violation shall be deemed to be properly served if
> a copy thereof is delivered to such persons prescribed in Section A-502.3 by one or
> more of the following:
>
> 1. Personally;
> 2. By first class mail to the last known residence or business address;
> 3. By certified or registered mail to the last known residence or business address,
>    return receipt requested;
> 4. By leaving it in the possession of an adult member of the person's family;
> 5. By leaving it in the possession of an adult in charge of the premises or persons place
>    of business; or
> 6. *If no address is known or the mail is returned indicated no delivery, a copy of the
>    notice shall be posted in a conspicuous place at the entrance or avenue of access
>    to the premises* and such procedure shall be deemed the equivalent of personal
>    notice.

Phila. Admin. Code § 4–A502.4 (emphasis added).  Similarly, the sections of the Philadelphia

Property Maintenance Code related to imminently dangerous structures require both personal

service:

> **Notice.** If an imminently dangerous condition is found, the code official *shall serve
> on the owner, managing agent or person in control of the structure a written
> notice* describing the imminent danger and specifying the required repair to render
> the structure safe, or requiring the imminently dangerous structure or portion

thereof to be demolished within a stipulated time.

PM-110.2 (emphasis added), and posted notice:

> **Posting notice:** Regardless of whether the person addressed with a notice of imminent danger receives service by one or more of the methods specified in the administrative code, *a copy of the notice shall be posted in a conspicuous place on the premises*; and such procedure shall be deemed the equivalent of personal service.

PM-110.3 (emphasis added).  The Department ensures that building inspectors are familiar with these requirements by training and testing them on the Administrative Code and Philadelphia Property Maintenance Code, and by including a copy of Property Maintenance Code § 110 in the CSU Field Manual.  (Doc. No. 29-6 at pp. 12–14.)  These policies and practices comply with *Jones* and ensure notice is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."

Our conclusion is consistent with previous holdings of this Court that the City's policies are constitutionally adequate.  *See Winn & Sons, Inc.*, 162 F. Supp. 3d. at 461.  In *Winn & Sons, Inc.*, the plaintiffs claimed that the City of Philadelphia violated their due process rights when it "demolished their property without first notifying them that the building had been declared imminently dangerous and affording them an opportunity to appeal the decision or repair the property." 162 F. Supp. 3d at 459–60.  Like Johnson, the plaintiffs argued that the City's notice was constitutionally deficient because "the certified mail receipt was returned," and there was no proof that the notice was posted on the building.  *Id.* at 460.  The City moved for summary judgment, arguing that the plaintiffs "failed to identify any policy or custom that was the moving force behind the alleged violations." *Id.*  The district court agreed.  After reviewing the Philadelphia Property Maintenance Code and the CSU Field Manual, this court found that the

16

"methods prescribed by the Administrative Code — mail and personal service — are constitutionally adequate under the governing case law" and "sufficient to ensure 'reasonably calculated' notice to property owners before their property is seized and demolished." *Id.* at 461.

Here, Johnson does not identify a policy, procedure, or custom that he believes is unconstitutional. Instead, Johnson states that the City "does not have a policy or method of sharing inter-departmental information even in urgent or exigent circumstances," and the Department lacks "a consistent method of contacting a property owners [sic] regarding code violation issues." (Doc. No. 31 at p. 7.) But the only evidence that Johnson cites for the City's failure to search the records of other departments for an owner's last known address is Stallworth's actions in this case. Similarly, the only evidence that Johnson has presented of the Department's failure to send notice to every address that it has for an owner is Stallworth's actions in this case. Even assuming Stallworth's actions were inadequate, a one-time failure to provide notice does not amount to a custom or policy of unconstitutional conduct for which the City may be held liable under § 1983. *See Mulholland*, 706 F.3d at 239 ("[A] one-time failure to [provide notice] would not subject the County to municipal liability under § 1983 because it does not show that the failure resulted from an agency policy or custom."); *see also Losch*, 736 F.2d at 911 ("A policy cannot ordinarily be inferred from a single instance of illegality . . . ."); *Swinson v. City of Phila.*, No. 13-6870, 2015 WL 4975077, at *7 (E.D. Pa. Aug. 19, 2015) (finding that at most, the plaintiff showed "negligence in this one instance involving [the plaintiff's] address," but "evidence of a single occurrence is generally not sufficient for *Monell* purposes," and without "additional proof that this is a commonplace shortcoming, the City cannot be held liable").

Somewhat confusingly, in his opposition brief Johnson argues that the "proper protocol"

17

and Department custom requires employees to send notice "to all of the Plaintiff's known addresses," and that Stallworth violated that proper protocol in this case.  (Doc. No. 31 at pp. 2, 8.)  Johnson notes that "other inspectors who had been assigned to the subject property prior to Inspector Stallworth did take action reasonably calculated to reach the Plaintiff," and then describes two instances where a Department employee sent notice to multiple addresses that the City had for Johnson, including his home address. (Doc. No. 31 at p. 8.)  These two instances, Johnson asserts, "demonstrate that the general routine and expected practice of code violation inspectors employed by the [Department] was to send the code violation notices via regular mail to all known addresses for the property owner," and in "such a manner, the code violation notices were reasonably calculated to reach the property owner."  (Doc. No. 31 at pp. 8–9.)  Johnson takes issue with the fact that Stallworth did not comply with that "expected practice."  (*Id.* at p. 9.)  That argument, however, misunderstands the § 1983 inquiry as explained in *Monell*, which looks at whether the government has adequate policies, not at whether a government official complied with those policies.  *See Winn & Sons, Inc..* 162 F. Supp. 3d at 462 ("In simple terms, Plaintiffs have not put forth a lack of adequate policies, which is their burden, but a lack of compliance with what are, by Plaintiffs' own arguments, otherwise fully adequate policies.").

As this Court explained in *Winn & Sons, Inc.*, although there may have been a genuine issue of fact about "whether notice was actually provided in this case, or whether particular government employees failed in their responsibilities to follow City policies," those facts were "not *material*" because the plaintiffs chose to "sue the City alone rather than the offending officers."  *Id.*  Here, as in *Winn & Sons, Inc.,* the "City had sufficient guidelines in place to ensure notice was given, and in the absence of any evidence that such guidelines were routinely ignored . . . those violations did not occur *pursuant* to a policy or custom of the City" and

"Plaintiffs' claims must fail as a matter of law."  *Id.*

Next, Johnson argues that the City violated his procedural due process rights when it demolished the property "without any reasonable effort to determine that it was in imminent danger of collapse." (Doc. No. 31 at p. 1.)  Johnson asserts that the property was not in immediate danger of collapse and that Stallworth only changed his rating to "imminently dangerous" because the fire department reported an issue with the property.  (*Id.* at pp. 3–5.) Once again, those allegations are specific to Stallworth's investigation in this case.  *See Losch*, 736 F.2d at 911 ("A policy cannot ordinarily be inferred from a single instance of illegality . . . .").  Johnson does not identify a policy, procedure, or custom that allows demolition without an independent investigation and finding that the property poses an imminent danger.[10]

To the contrary, the CSU Field Manual outlines the written policies and procedures that govern property inspections and classifications.  (*See* Doc. No. 29-6 at pp. 3–4, 8–18.)  Under those policies, City employees are required to investigate properties, rate them on a scale of 1 to 5 when they find a structural issue, conduct additional investigations as necessary, and demolish buildings only after finding that they are imminently dangerous.  (*See id.* at 3–4, 17–18, 52.) Stallworth testified that inspectors are given copies of these policies, that they are trained and tested on those policies when they begin working with the Department, and that they use the policies in their daily routine at work.  (Doc. No. 29-3 at 18:11 to 20:13.)  Even assuming that Stallworth's investigation was inadequate in this case, Johnson has not shown that it was influenced by an inadequate policy or custom of the City.  *See Mulholland*, 706 F.3d at 239 (affirming district court's finding that Berks County could not be held liable under § 1983

---

[10] Johnson also argues for the first time in his opposition brief that Stallworth was unqualified to determine whether the building was in immediate threat of collapse.  But even assuming that Stallworth is unqualified, Johnson does not point to any evidence showing that the City has a custom of hiring unqualified inspectors.  *See Losch*, 736 F.2d at 911.

because even if the government's investigation was constitutionally inadequate in that case, "it cannot be said to have been influenced by a policy or custom of" the local agency (quotation marks omitted)).  Without more, we cannot find that the City itself has violated Johnson's procedural due process rights.[11]

### 2.   *Substantive Due Process Claim*

Last, Johnson claims that the City violated his right to substantive due process when it demolished the property "without giving Plaintiff proper written notice." (Doc. No. 1 at pp. 26–27; Doc. No. 31 at 1.)  "To establish a substantive due process violation by a municipality, a plaintiff must show that executive action was so ill-conceived or malicious that it shocks the conscience."  *Mulholland*, 706 F.3d at 241 (quotation marks omitted).

To the extent that Johnson's substantive due process claim is based on his claim that the City was negligent in failing to send notice to Johnson's residential address (Doc. No. 31 at p. 6. (arguing that there is a "genuine issue of material fact whether the Defendants were *negligent* in their failure to send code violations to the Plaintiff at his residential address or at least at one of his other properties" (emphasis added))), that claim fails because "the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property."  *Daniels v. Williams*, 474 U.S. 327, 331 (1986); *see also Swinson*, 2015 WL 4975077, at *7 (finding that the plaintiff had at most shown "negligence in this one instance involving [the plaintiff's] address" but "[n]egligence is insufficient to demonstrate a violation of due process").

---

[11] The parties' briefs on summary judgment and the papers for Johnson's pending *Daubert* motion take great pains to analyze whether and to what extent the rowhomes were imminently dangerous.  But because Johnson has sued *only* the City, and he has not identified a policy, practice, or custom as the cause of his alleged injuries, it is immaterial whether the property was imminently dangerous.  To find otherwise would misconstrue the *Monell* inquiry.

In addition, as discussed above, the City has policies in place to ensure property owners receive personal service and posted notice that their property is either unsafe or imminently dangerous and subject to demolition.  *See* Phila. Admin. Code § 4–A502; PM-110.2; PM-110.3. That notice informs them of their right to appeal an investigator's findings and gives the owner an opportunity to either correct the defect or prove that it is not a danger.  Those policies do not "shock the conscience," and there is no evidence that investigators customarily ignore them.  *See Winn & Sons, Inc.*, 162 F. Supp. 3d at 462–63 (finding that "the City had sufficient policies to prevent buildings from being demolished arbitrarily" and that "[w]ithout evidence that these policies were routinely ignored (and to a shocking degree) — not just that oversight may have been lacking in this particular case — the City cannot be held liable under *Monell*").

Because there is no evidence that the City had a policy or custom of providing constitutionally inadequate notice to the owners of imminently dangerous structures or of inadequately investigating structures before ordering demolition, Johnson's due process claims fail, and we need not analyze whether there was a constitutional deprivation in this case.[12]

## IV.   *Conclusion*

For the reasons set forth above, the Court grants the City's motion for summary judgment on all counts.[13]  An appropriate Order follows.

---

[12] The City notes that Johnson never updated the address that appears in the deed for the Brunner Street property and suggests that this is justification for a finding of no constitutional deprivation.  (Doc. No. 29 at p. 16–17.)  Although we do not rule on the underlying constitutionality of the notice provided by the City, we remind it that a plaintiff's failure to "keep his address updated" does not "forfeit[ ] his right to constitutionally sufficient service."  *Jones*, 547 U.S. at 230.

[13] Johnson states that he plans to call additional witnesses at trial, but that is not a sufficient ground for denying summary judgment. *See, e.g.*, *Marion v. City of Phila.*, No. 00-3553, 2002 WL 31761426, at *4 (E.D. Pa. Dec. 9, 2002) ("Plaintiff's response to the motion that the conspiracy will be proven at trial is insufficient to defeat summary judgment.").